## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | | |
|---|---|---|
| JAMES E. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-22-JFA-JRM |
| | ) | |
| v. | ) | |
| | ) | |
| MICHELIN NORTH AMERICA, INC., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

*Pro se* Plaintiff, James E. Smith ("Smith"), filed his complaint in this matter on January 6, 2009. He alleges that his former employer, Michelin North America, Inc. ("Michelin"), terminated him because of his race (African-American) in violation of 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and 42 U.S.C. § 1981. Michelin filed a motion for summary judgment on December 4, 2009. Because Smith is proceeding *pro se*, an order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) was issued on December 7, 2009, advising him of his responsibility to respond to the motion for summary judgment. Smith filed his response on January 27, 2010. Michelin filed a reply on February 8, 2010.

Michelin's motion for summary judgment is supported by Smith's deposition testimony ("Pl.Dep.___") and exhibits thereto ("Pl.Dep., Ex. ___"), together with the affidavit of Mark Wilkins ("Wilkins Aff."), and copies of Smith's answers to serval interrogatories (Def.Mem., Ex. C). Smith's opposition memorandum is supported by a copy of an unsworn written statement made by Kenneth Henrick to Carlton S. King on February 28, 2008, which was produced by Michelin to Smith in discovery ("Pl.Mem., Ex. A") and Smith's affidavit ("Pl.Aff.").

**Facts**

The record reveals the following facts in the light most favorable to Smith:

1. Smith is African-American

2. Smith began working for Michelin in Alabama in 1978, but later transferred to Lexington, South Carolina. (Pl.Aff., ¶ 1).

3. At the Lexington facility, OCY is the Manuel Tire Building Shop where tires are produced. (Pl.Aff., ¶ 1; Wilkins Aff., ¶ 1).

4. Smith was a troubleshooter in NSY-1, a maintenance department for OCY. (Pl.Aff., ¶ 1).

5. Wilkins, at relevant times was OCY Tech Manager responsible for overall technical support of the production department. As such, Wilkins was Smith's direct supervisor. (Pl.Aff., ¶ 2; Wilkins Aff., ¶ 2). Wilkins was supervised by Steve Phillips ("Phillips"), OCY Shop Manager.

6. Smith's performance evaluations were generally acceptable, although communication problems were noted. In 2005, he was given a written warning for misuse of a computer. (Pl.Dep., Exs. 1-6).

7. Smith encountered no problems with Wilkins until September of 2007. (Pl.Aff., ¶ 3).

8. On September 13, 2007, Wilkins received a report from Dave Howard, a white Dimensional Quality Technician in Smith's department, concerning Smith and an African-American operator, Margaret Jackson. The record contains no details of this episode. According to Wilkins, the report indicated that "Mr. Smith responded negatively to a trouble shooting call from an operator, Margaret Jackson." Wilkins

2

investigated the report by talking to Karl Tillman, an African-American Business Unit Leader ("BUL"), who corroborated the report. He also spoke with Andy Stevenson, a white BUL, who told him that "Ms. Jackson was afraid to call for troubleshooting assistance for fear of how Mr. Smith would react when he arrived at her machine." Wilkins also spoke with Nelson Hendrix, a white trouble-shooter on Smith's shift. Hendrix stated that "Mr. Smith had also been closing out complaint calls without investigating them because he assumed they were product-related issues (not machine- related issues)." Last, Wilkins spoke with Rosalind Farley, an area personnel manager "about how to address the issues with Mr. Smith." (Wilkins Aff., ¶¶ 3-6).[1]

9. On the next day, Wilkins spoke with Smith. Smith denied the conduct reported to Wilkins and told him that he did not know what Wilkins was talking about. (Pl.Aff., ¶ 4; Wilkins Aff., ¶ 7).

10. Wilkins never got back to Smith with final results of the investigation. (Pl.Aff., ¶¶ 5-6).

11. On September 19, 2007, a BUL reported to Wilkins that the conveyor system in the OCY was down. According to Wilkins "(t)he conveyor system is a critical function and is used to move newly manufactured tires to a separate area of the facility. If the

---

[1] In his affidavit, Smith states that "from reading documents during the course of this proceeding" he learned that in September of 2007 Wilkins contacted Farley "for instructions on how to fire a member of a protected group." (Pl.Aff., ¶ 18). However, Smith has not produced the documents that would support his statement.

3

conveyor goes down, manufacturing has to stop until it is up and running again." (Wilkins Aff., ¶ 8).

12. Wilkins located Smith in the troubleshooter's office and asked him to respond to the conveyor belt problem. Smith told Wilkins that he would respond after he finished eating his lunch. (Pl.Aff., ¶ 7; Wilkins Aff., ¶ 11).

13. Wilkins then directed another employee to repair the conveyor belt. (Pl.Aff., ¶ 7; Wilkins Aff., ¶ 11).

14. At a meeting later that day, Wilkins told Smith his failure to respond was insubordination and that he would be disciplined. (Pl.Aff., ¶ 9; Wilkins Aff., ¶ 12).

15. On September 26, 2007, Smith met with Wilkins and Phillips. Smith told them he thought the conveyor belt issue had been fabricated.[2] (Pl.Aff., ¶¶ 10-11; Wilkins Aff., ¶ 13).

16. On September 28, 2007, Smith was issued a "Final Written Warning" for "General Job Performance" including "insubordinate behavior, difficulty in communicating with co-workers and OCY customers, and less than acceptable job performance in the NSY 1 shop." He was given a written corrective action plan. In effect, Smith was on probation for twelve months. (Pl.Dep., Exs. 10-11; Pl.Aff., ¶ 12; Wilkins Aff., ¶ 15).

17. There were no interim reviews of Smith's compliance with the corrective action plan. (Pl.Aff., ¶ 13).

---

[2]Smith and Wilkins also addressed a complaint that Smith was using a three wheeled shop bicycle in an inappropriate manner. There is some confusion as to whether this occurred in December of 2006 or September of 2007. *See* Def.Mem., p. 5 and Wilkins Aff., ¶ 13.

18. Michelin prepared for an annual shutdown between Christmas and New Years. "All troubleshooters were expected to work during that time, regardless of their normal shift schedule." (Wilkins Aff., ¶ 16).

19. Prior to the shutdown, Smith met with Wilkins to determine his schedule during the shutdown. It was agreed that Smith would be off on December 26 and 27, 2007, but would work 12 hour shifts on December 28, 29, 30, and 31, 2007. (Pl.Aff., ¶ 16; Wilkins Aff., ¶ 16).

20. Smith worked as scheduled until December 31, 2007. On that day he worked five hours and left without notifying anyone. (Pl.Aff., ¶ 16; Wilkins Aff., ¶ 17).

21. Wilkins met with Smith on January 2, 2008 to discuss his actions. Smith admitted that he left early. (Pl.Aff., ¶ 16; Wilkins Aff., ¶ 18).

22. Smith was terminated on January 7, 2008. (Pl.Aff., ¶ 17; Wilkins Aff., ¶ 19).

## **Discussion**

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Id.* (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, Michelin "bear(s) the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If Michelin carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [*see* Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., *supra*. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

Title VII prohibits an employer from terminating an employee because of his race, and the employee must show that "but for" his race he would not have been terminated.

Smith alleges a violation of 42 U.S.C. § 2000e-2(a). That statute provides:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . .

This is a disparate treatment case and Smith must prove that "but for" his race, he would not have been terminated. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). Smith can prove Michelin's motive to discriminate by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Company, 955 F.2d 936 (4th Cir. 1992).

To overcome a motion for summary judgment, under the ordinary standards of proof, Smith is required to produce direct evidence of a stated purpose to discriminate on the basis of race and/or circumstantial evidence of a stated purpose to discriminate on the basis of race of sufficient probative force to reflect a genuine issue of material fact. Goldberg v. B. Green and Co., Inc., 836 F.2d 845 (4th Cir. 1988). Smith has produced no direct evidence.

In order to establish a prima facie case of discrimination, Smith must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the

7

adverse action, he was performing at a level that met Michelin's legitimate expectations; and (4) that similarly situated Michelin employees outside his protected class were retained under similar circumstances.[3] Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

Michelin concedes that Smith has established the first two elements. However, Michelin argues that Smith has not established the second two elements.

**a. Job Performance/Michelin's Legitimate Expectations**

Michelin argues that Smith cannot establish a prima facie case of discrimination because, at the time of his discharge, he was not performing at an acceptable level, and he has not shown that others outside the protected class were retained under similar circumstances.

The record shows that Smith's long career with Michelin was unremarkable until September of 2007. During that month two events occurred which led to the issuance of a final written warning, i.e., the confrontation with Jackson, and Smith's failure to respond to the conveyor belt breakdown.

Smith insists that there was no confrontation with Jackson on September 13, 2007. However, he does not deny having responded to a call from Jackson on that date. Wilkins states that he received a complaint and investigated it. He spoke with several employees and concluded that Smith "responded negatively to a trouble shooting call from an operator, Margaret Jackson." (Wilkins Aff., ¶ 3). There is nothing in the record to support a conclusion that Wilkins talked directly to Jackson. Smith's "negative" response may have been no response at all (i.e., he did not speak with Jackson),

---

[3]The Fourth Circuit has recognized that the fourth prong of this framework is necessarily flexible to address varying circumstances. S*ee* Miles v. Dell, Inc., 429 F.3d 480, 487 (4th Cir. 2005) (citing EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851, n. 2 (4th Cir. 2001) for the proposition that "what is critical with respect to the fourth element is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) 'under circumstances which give rise to an inference of discrimination'" quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

8

or that they disagreed about the source of the complaint and whose responsibility it was to correct the problem. Smith touched on the relationship between troubleshooters and operators (and he and Jackson) during his deposition:

> **Question**: And explain to me what it was you were complaining about when you - - when you spoke about that frustration?
>
> **Answer:** Well, operators abuse their troubleshooters.
>
> **Question:** They abuse them?
>
> **Answer:** Right. There are simple tasks that operators are supposed to do. Say, for instance, a rubber jam, you know, it takes a little muscle, but they can pull the rubber out, but they'll call a troubleshooter instead. Things like that.
>
> **Question:** So you felt - -
>
> **Answer:** On occasion there are times when they need a troubleshooter to get something out like a rubber jam if it's extreme. But on most cases, they just don't want to.
>
> **Question:** Did - - and did you ever express that frustration to an operator? In other words - -
>
> **Answer:** No.
>
> **Question:** - - say an operator called you to get some rubber out of a machine, did you ever tell them that that's something they needed to be doing - -
>
> **Answer:** No.
>
> **Question:** - - or else confront them about that?
>
> **Answer:** No.
>
> **Question:** Would you be surprised if operators had made comments about you being rude to them about having

|            |                                                                                                       |
|------------|-------------------------------------------------------------------------------------------------------|
|            | to respond to troubles on their machines? Would that surprise you to hear?                            |
| **Answer:**   | Sir, well, it's depending on the operator.                                                         |
| **Question:** | So you wouldn't be surprised for some operators to say that about you?                             |
| **Answer:**   | Right. I wouldn't be surprised if Margaret Jackson said that.                                      |
| **Question:** | Can you think of any other operators who may have that opinion of you?                             |
| **Answer:**   | No.                                                                                                |
| **Question:** | Okay. Now, what's - - what's the issue with Margaret Jackson that she – that you think she would say that about you? |
| **Answer:**   | I don't know. Certain people get it in their mind that they just don't like you.                   |
| **Question:** | So you don't - - you feel like Margaret Jackson didn't like you?                                   |
| **Answer:**   | I think so.                                                                                        |
| **Question:** | Did you like her?                                                                                  |
| **Answer:**   | Yes, Sir. Yeah.                                                                                    |

(Pl. Dep. 23-24).

Wilkins was directly involved in the conveyor belt malfunction. He received a report, and asked Smith to respond. Even Smith concedes that when he did not immediately respond, Wilkins went into "an adjacent office and ask (sic) some (sic) else to go check on the conveyor belts." (Pl.Aff., ¶ 7). This is the incident which led to the issuance of the Final Written Warning.

However, the New Year's Eve event is the one that actually resulted in Smith's termination. Michelin argues that Smith cannot establish the forth prong of the prime facie case because the white comparators named by Smith sought and obtained permission to leave early and arrive late. Smith concedes that the left early and did not tell anyone that hew as leaving. Even though Wilkins states that the white comparators sought approval, he does not establish that approval was a requirement. (Wilkins Aff., ¶ 17).

Smith states that he did not inform anyone "because the whole shop was working flexible hours." (Pl.Aff., ¶ 16). This statement is uncontradicted. The fact that others may have consulted with Wilkins and gained his permission to alter their schedules does not establish that Smith was required to do so. In fact, it is not clear when the white comparators consulted with Wilkins, and Wilkins' affidavit does not establish that he, or any other supervisor, was at work on New Year's Eve. Further, Smith's statement is supported by a written statement given by Kenneth Henrick to Carlton S. King on February 28, 2008. The statement was produced to Smith by Michelin in discovery. In summary Henrick told King:

> I spoke with Kenney on 28 Feb. 2008 and asked him to review the process for coming and going in NSY-1 during shutdowns. Kenney said that he normally worked 0730-1600 during shutdowns and that shutdowns are normally done a little different. People come in and leave early when they wanted to an it is normally not a problem. I asked Kenney if he or others had to alter there(sic) work schedule for whatever reason, how would he handle it? Would he check out with Mark Wilkins or Mike Black? He stated that if they were around he would consult with them on leaving. He also stated that normally altered times would be worked out in advance and these events would be cleared with appropriate persons based on prior knowledge. Kenney also stated that you could never get all of the shutdown work done because there is always more work than there is time.
>
> Kenney also mentioned that he felt that there was a witch hunt for James because he and the boss did not get along for whatever reason. He also stated that if the only reason that James lost his job was for leaving early that this was not right and that he should have his job back.

11

(Pl.Mem., Ex. A).

This statement was given well after Smith's discharge, and the undersigned assume that it was a part of the EEOC investigation. In the light most favorable to Smith, Michelin did not have a policy which required Smith to seek permission to leave early during the shutdown when the NSY-1 employees worked flexible schedules. The absence of such a requirement renders irrelevant Michelin's argument that other sought permission to alter their schedules. The undersigned concludes that Smith has established a prima facie case of race discrimination because in the light most favorable to him, he was discharged under circumstances giving rise to an inference of discrimination.

**b. Pretext**

Michelin argues alternatively that it has proffered a legitimate, non-discriminatory reason for Smith's termination, i.e., his poor performance. Under the standard McDonnell-Douglas analysis, if the plaintiff establishes a prima facie case, a rebuttable presumption is created that the adverse act was due to unlawful discrimination. The defendant at that point must then come forward with a legitimate, non-discriminatory reason for its action. When the defendant does so, the presumption of discrimination evaporates, and the plaintiff must prove the defendant's proffered reason is pretextual and that the adverse act was the result of discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 504 (1993).

Here, the same reason given for termination is proffered as the legitimate, non-discriminatory reason that the action was taken. In the end, Michelin asserts that Smith was terminated because he left work early on New Year's Eve. As discussed above, based on this record and in the light most favorable to Smith, there was no requirement that Smith obtain permission to leave work early during

the shutdown. A reasonable jury could conclude that Michelin's action was a pretext for discrimination.

## **<u>Conclusion</u>**

Based on a review of the record, it is recommended that Defendant's motion for summary judgment be **denied.**

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

May 24, 2010